**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Clarksburg Division**

**JOSEPH BOCZEK,**

        **Plaintiff,**

**vs.**

**PENTAGON FEDERAL CREDIT
UNION d/b/a PENFED,**

        **Defendant.**

                              **Civil Action No. 1:23-CV-43 (KLEEH)**

**PENTAGON FEDERAL CREDIT UNION'S OPPOSITION TO
JOSEPH BOCZEK'S MOTION FOR CLASS CERTIFICATION**

DATED: August 29, 2025.          **PENTAGON FEDERAL CREDIT UNION**

Brian J. Moore (WV State Bar # 8898)
DINSMORE & SHOHL LLP
P.O. Box 11887
707 Virginia Street East, Suite 1300
Charleston, WV 25339-1887
Telephone:   (304) 357-0900
Facsimile:   (304) 357-0919
Email:  brian.moore@dinsmore.com

Kinsey M. Novak Booth (WV State Bar # 14661)
DINSMORE & SHOHL LLP
215 Don Knotts Blvd., Suite 310
Morgantown, WV 26501
Telephone: (304) 225-1416
Facsimile: (304) 296-6116
Email: kinsey.booth@dinsmore.com

Michael A. Graziano (*pro hac vice*)
Sarah A. James (*pro hac vice*)
Eckert Seamans Cherin & Mellott, LLC
1717 Pennsylvania Ave., NW, 12th Floor
Washington, DC 20006
(202) 659-6671
(202) 659-6699 (fax)
mgraziano@eckertseamans.com
sjames@eckertseamans.com
*Attorneys for Defendant*

i

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT .................................................................................. 1

II. PROCEDURAL BACKGROUND .......................................................................... 5

III. FACTUAL BACKGROUND ................................................................................ 5

IV. STANDARD .................................................................................................... 11

V. ARGUMENT ...................................................................................................... 11

    A.    THE PROPOSED CLASS IS NOT ASCERTAINABLE ........................................... 11

        1.    Determining Whether Borrowed Funds Were Used Primarily for Personal, Family, or Household Purposes Requires Fact-Intensive, Individualized Inquiries .... 12

        2.    There Is No Administratively Feasible Method for Determining Whether an Account Has Sufficient Ties to West Virginia ................................................................. 16

        3.    Allegations of Fraudulent and Threatening Statements Are Individualized ........ 18

    B.    BOCZEK'S CLAIMS OF FRAUD AND THREATS FAIL TYPICALITY ............. 19

    C.    BOCZEK CANNOT ESTABLISH PREDOMINANCE OR SUPERIORITY ......... 20

        1.    Boczek Cannot Establish Predominance .................................................. 20

        2.    Boczek Cannot Establish Superiority ....................................................... 22

VI. CONCLUSION .................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**

*Adkins v. Credit Acceptance Corp.*, No. 2:16-CV-03343, 2016 WL 7451619 (S.D.W. Va. Dec. 28, 2016) ........................................................................................................... 1, 12, 13, 21

*Am. Exp. Co. v. Koerner*, 452 U.S. 233 (1981) ...................................................... 14, 15

*Career Counseling, Inc. v. AmeriFactors Fin. Grp.*, LLC, 91 F.4th 202 (4th Cir. 2024) .. 1, 11, 16

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ........................................................... 11

*Deiter v. Microsoft Corp.*, 436 F.3d 461 (4th Cir. 2006)............................................... 19

*EQT Prod. Co. v. Adair*, 764 F.3d 347 (4th Cir. 2014) ...................................... 1, 11, 16

*Fleet v. Webber Springs Owners Ass'n, Inc.*, 772 S.E.2d 369 (W. Va. 2015)......................... 2, 13

*Golan v. FreeEats.com, Inc.*, 930 F.3d 950 (8th Cir. 2019) .................................... 4, 22

*In re Onstar Contract Litig.*, 278 F.R.D. 352 (E.D. Mich. 2011).................................... 2

*Loughlin v. Amerisave Mortg. Corp.*, No. 1:14-CV-3497-LMM-LTW, 2018 WL 1894609 (N.D. Ga. 2018)........................................................................................................... 2, 15, 16

*McLaughlin v. Chrysler Corp.*, 262 F. Supp. 2d 671 (N.D.W. Va. May 3, 2002), *aff'd*, 47 F. App'x 659 (4th Cir. 2002) ........................................................................... 14, 15

*Morris v. Marshall*, 305 S.E.2d 581 (W. Va. 1983) ................................................. 2, 13

*Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925 (4th Cir. 2025) ..................................... 22

*Powers v. Fifth Third Mortg. Co.*, No. 1:09-cv-2059, 2011 WL 3811129 (N.D. Ohio Aug. 12, 2011) ........................................................................................................... 2, 15, 16

*Rhoades v. W. Virginia Credit Bureau Reporting Servs., Inc.*, 96 F. Supp. 2d 528 (S.D.W. Va. 2000) ........................................................................................................... 18

*Roman v. First Franklin Fin. Corp.*, No. 00 C 7228, 2001 WL 322563 (N.D. Ill. March 3, 2011) ........................................................................................................... 2, 15

*Rowden v. Pacific Parking Sys., Inc.*, 282 F.R.D. 581 (C.D. Cal. July 2, 2012) ..................... 4, 23

*Sheridan v. Ally Fin., Inc.*, 776 F. Supp. 3d 375 (S.D.W. Va. 2024)................................. 3, 18, 19

*Sheridan v. Ally Fin., Inc.*, No. 5:23-CV-00616, 2025 WL 2055556 (S.D.W. Va. July 22, 2025) ................................................................................................................ 19

*Sheridan v. Ally Fin., Inc.*, No. 5:23-CV-00616, 2025 WL 2055750 (S.D.W. Va. July 22, 2025) ................................................................................................................ 19

*Stafford v. Bojangles' Restaurants, Inc.*, 123 F.4th 671 (4th Cir. 2024) ............................... 20, 22

*Stillmock v. Weis Markets, Inc.*, 385 Fed. App'x 267 (4th Cir. 2010) ......................................... 23

*Toldy v. Fifth Third Mortg. Co.*, No. 1:09 CV 377, 2011 WL 4634154 (N.D. Ohio Sept. 30, 2011) ..................................................................................................................... 2, 15

*Wakefield v. ViSalus, Inc.*, 51 F.4th 1109 (9th Cir. 2022) ....................................................... 4, 21

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ......................................................... 11

**Statutes**

Telephone Consumer Protection Act .............................................................................................. 16

W. Va. Code § 127 ................................................................................................................... passim

W. Va. Code § 127(d) ................................................................................................................ 1, 19

W. Va. Code § 127(g) ................................................................................................................ 1, 19

W. Va. Code § 128 ..................................................................................................................... 1, 12

W. Va. Code § 128(c) ...................................................................................................................... 1

W. Va. Code § 128(d) ...................................................................................................................... 1

W. Va. Code § 46A-2-122(b) ............................................................................................... 2, 12, 13

W. Va. Code § 46A-2-124(f) .................................................................................................. passim

W. Va. Code § 46A-5-101(1) ..................................................................................................... 4, 22

W. Va. Code § 46A-5-104 .......................................................................................................... 4, 22

W. Va. Code § 46A-5-106 .......................................................................................................... 4, 22

W. Va. Code § 46A-5-108 .......................................................................................................... 4, 23

West Virginia Consumer Credit and Protection Act ................................................................ passim

iv

**Rules**

Fed. R. Civ. P. 23 ................................................................................................ passim

Fed. R. Civ. P. Rule 30(b)(6) ............................................................................... 8

## I. PRELIMINARY STATEMENT

Joseph Boczek claims Pentagon Federal Credit Union ("PenFed") violated the West Virginia Consumer Credit and Protection Act ("WVCCPA") by charging a convenience fee when Boczek made loan payments using a particular method. (*See generally* Am. Compl., Dkt. No. 74.) Specifically, PenFed charges a $5.00 fee each time a member chooses to make an electronic transfer to a PenFed account from an outside account through the automated clearinghouse system ("ACH") with an employee's assistance. (Pl.'s Ex. C, Dkt. No. 101-3 at Interrog. No. 18.)

Boczek asserts claims under seven provisions of the WVCCPA, W. Va. Code §§ 46A-2-124(f) ("Section 124(f)"), 46A-2-127 ("Section 127"), 46A-2-127(d) ("Section 127(d)"), 46A-2-127(g) ("Section 127(g)"), 46A-2-128 ("Section 128"), 46A-2-128(c) ("Section 128(c)"), and 46A-2-128(d) ("Section 128(d)"). (Am. Compl. ¶ 42.) Now, he asks the Court to certify a class under Rule 23 of the Federal Rules of Civil Procedure. (Pl.'s Mem., Dkt. No. 101.) Despite invoking seven separate statutory provisions, Boczek proposes a single class definition. (*Id.* at 2.)

The Court should decline to certify a class because Boczek has not satisfied the "'threshold requirement of ascertainability[.]'" *Career Counseling, Inc. v. AmeriFactors Fin. Grp.*, LLC, 91 F.4th 202, 206 (4th Cir. 2024) (quoting *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (internal quotation omitted)). That is, Boczek has not established that "a court can readily identify the class members in reference to objective criteria … without extensive and individualized fact-finding or 'mini-trials[.]'" *Id.* (quotation omitted).

Boczek cannot establish ascertainability for three reasons. First, he ignores an "essential element" of WVCCPA claims: whether the challenged activity arose in "the collection or attempted collection of a 'claim[.]'" *Adkins v. Credit Acceptance Corp.*, No. 2:16-CV-03343, 2016 WL 7451619, at *3 (S.D.W. Va. Dec. 28, 2016). The WVCCPA defines "claim" as an obligation

1

to pay money but only if the obligation arises from a transaction that is for "primarily for personal, family, or household purposes[.]" *Id.* (quoting W. Va. Code § 46A-2-122(b)).

Analyzing whether a specific obligation was incurred "primarily for personal, family, or household purposes" is an individualized inquiry that turns on the details of specific transactions. *Compare Morris v. Marshall*, 305 S.E.2d 581, 582-84 (W. Va. 1983) (personal guarantees of loans financing an auto-dealership were not consumer loans) *with Fleet v. Webber Springs Owners Ass'n, Inc.*, 772 S.E.2d 369, 376-79 (W. Va. 2015) (homeowners association assessments were consumer transactions to the extent used to improve common areas used by residents). Boczek's own deposition testimony illustrates the point because he could not recall whether he used a business account or a personal account to pay the fees at issue. (Boczek Dep., Ex. 1 at 46:4-22.)

Several federal courts have denied motions for class certification in similar cases due, at least in part, to the fact-intensive inquiry necessary to determine whether any particular transaction was made for a covered purpose. *See, e.g., In re Onstar Contract Litig.*, 278 F.R.D. 352, 380-81 (E.D. Mich. 2011); *Loughlin v. Amerisave Mortg. Corp.*, No. 1:14-CV-3497-LMM-LTW, 2018 WL 1894609, at *15-16 (N.D. Ga. 2018); *Toldy v. Fifth Third Mortg. Co.*, No. 1:09 CV 377, 2011 WL 4634154, at *3-4 (N.D. Ohio Sept. 30, 2011); *Powers v. Fifth Third Mortg. Co.*, No. 1:09-cv-2059, 2011 WL 3811129, at *14-20 (N.D. Ohio Aug. 12, 2011); *Roman v. First Franklin Fin. Corp.*, No. 00 C 7228, 2001 WL 322563, at *2 (N.D. Ill. March 3, 2011). So too should this Court.

Second, Boczek appears to concede that any class must be limited to transactions with sufficient ties to West Virginia, but he does not propose any method—let alone an administratively feasible one—for tackling that formidable problem. As explained below, while PenFed can use electronic searches to match historical fee records to *current addresses*, determining whether any given member resided in West Virginia *at the relevant time* would require individualized reviews.

2

Third, four of the seven statutory provisions Boczek claims PenFed violated regulate conduct that is not subject to class-wide proof. Section 124(f) prohibits the use of "threat[s]" and Section 127 prohibits the use of certain types of "representation[s]" in the collection of debts. W. Va. Code §§ 46A-2-124(f), 46A-2-127. To analyze whether a debt collector engaged in threatening behavior or made deceptive statements, it is necessary to analyze each specific act or statement in the relevant context. *See Sheridan v. Ally Fin., Inc.*, 776 F. Supp. 3d 375, 387 (S.D.W. Va. 2024) (dismissing claims under Sections 124 and 127 for failure to allege any specific acts or statements that could be construed as deceptive, threatening, or coercive).

Moreover, even if issues related to deception, threats, and coercion were subject to class-wide proof, Boczek would not be able to satisfy Rule 23(a)'s "typicality" requirement. Boczek admitted during his deposition that none of the PenFed employees with whom he spoke made any fraudulent, deceptive, misleading, or threatening statements to him. (Boczek Dep., Ex 1 at 70:24-74:20.) In fact, with the exception of one innocuous comment about Boczek not making payments that were due, Boczek gave PenFed's customer service representatives a glowing review. (*Id.*)

The Court should deny Boczek's motion for the additional reason that it does not establish predominance or superiority, both of which are required to certify a class under Rule 23(b)(3). With respect to predominance, Boczek lists just two concrete issues that relate to liability. (*See* Pl.'s Mem., Dkt. No. 101 at 8.) One of the issues—whether PenFed "misrepresented the amount of any claim"—is individualized, not common, for reasons explained above. (*Id.*) Indeed, the sum of the individualized issues discussed in this brief far outweigh the one common issue Boczek lists.

Additionally, a class action is not a superior method for resolving the types of claims at issue. The class action mechanism is not necessary to enforce the WVCCPA because the statute itself provides significant incentives to encourage individuals with *de minimis* damages to sue.

Specifically, the WVCCPA provides that a consumer can recover actual damages plus attorney's fees and "a penalty of $1,000 per violation[.]" W. Va. Code §§ 46A-5-101(1), 46A-5-104. It also provides an "inflation" adjustment that could increase the penalty to $1,357.66 per violation. W. Va. Code § 46A-5-106. As a result, the potential recovery available to an individual claimant who paid the $5.00 fee at issue in this case is more than 271 times the amount of actual damages, before accounting for attorney's fees. If a borrower made monthly payments on just one loan during the four-year period corresponding to the statute of limitations, the borrower could claim just $240 in actual damages but seek up to $65,407.69 with penalties, plus attorneys' fees.

The stiff penalties available under the WVCCPA are more than adequate to deter violations and encourage individual litigation. *See, e.g., Rowden v. Pacific Parking Sys., Inc.*, 282 F.R.D. 581, 586-87 (C.D. Cal. July 2, 2012). In fact, aggregating claims and then applying a civil penalty with a multiplier of 217 times the amount of damages would raise a serious due process concern that would be far more problematic in a class action than it would in an individual action. *See, e.g., Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1120-25 (9th Cir. 2022); *Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 962-63 (8th Cir. 2019). Since Boczek claims PenFed charged a $5.00 fee 1,497 times, a class with $7,485.00 in total damages could theoretically seek $2,0039,902.02, plus fees.

Finally, resolving the claims in this case on a class-wide basis is disadvantageous for the additional reason that it would strip the WVCCPA's notice-and-cure provision of its efficacy. The WVCCPA requires consumers to use a mandatory notice-and-cure procedure before suing. W. Va. Code § 46A-5-108. The notice-and-cure procedure is designed to give defendants an opportunity to resolve individual claims and avoid litigation. Certifying a class consisting of hundreds of claimants who have not complied with the notice-and-cure requirement would directly undermine the legislative goal of promoting the pre-litigation resolution of claims.

## II. PROCEDURAL BACKGROUND

Boczek filed an amended complaint, which is currently his active pleading, on November 15, 2024 (the "Amended Complaint"). (Am. Compl., Dkt. No. 74.) PenFed filed an answer to the Amended Complaint on November 27, 2024 (the "Answer"). (Answer, Dkt. No. 75.)

The deadline for class discovery expired on July 18, 2025. (5/5/2025 Order, Dkt. No. 92.) On August 8, 2025, Boczek filed a motion for class certification. (Pl.'s Mot., Dkt. No. 100.) The motion is scheduled to be heard on October 6, 2025. (5/5/2025 Order, Dkt. No. 92.)

The Court has not established any further deadlines, including deadlines for merits-based discovery or dispositive motions. PenFed reserves the right to request additional discovery, as necessary, and to file a motion for summary judgment after the Court resolves class certification.

## III. FACTUAL BACKGROUND

### The $5.00 Convenience Fee

PenFed charges a one-time convenience fee of $5.00 when a member chooses to make an ACH transfer from an outside account to certain types of PenFed accounts with the assistance of a PenFed employee. (Pl.'s Ex. C, Dkt. No. 101-3 at Interrog. No. 18.) PenFed does not charge the fee when a member makes an ACH transfer without employee assistance, such as payments made over the phone through PenFed's interactive voice recognition system, payments made through PenFed's website, or payments made on the PenFed Mobile App. (*Id.*)

PenFed also does not charge the fee at issue for ACH payments on loans that are secured by real property. (*Id.*) It does, however, charge the fee for ACH payments on other types of loan products, such as, for example, unsecured personal loans, credit cards, loans secured by certificates of deposit, lines of credit covering overdrafts, and loans secured by vehicles. (30(b)(6) Dep., Ex. 2 at 128:8-131:10, 140:2-141:10, 162:4-164:7.)

Joseph Boczek's Individual Claims

In June 2022, Boczek became a member of PenFed and borrowed funds to refinance his prior purchase of a vehicle. (Boczek Dep., Ex. 1 at 33:1-12, 36:1-37:11; Loan Docs., Ex. 2.) The loan agreement required Boczek to make monthly payments. (Loan Docs., Ex. 2.) Boczek claims he paid the $5.00 convenience fee to make an ACH payment on the auto loan with the assistance of a PenFed employee a total of seven times. (Pl.'s Mem., Dkt. No. 101 at 3.)

Boczek is a small business owner. (Boczek Dep., Ex. 1 at 13:20-16:13, 18:11-23) Among other businesses, Boczek has operated a marketing company, JB Business Strategies, as a sole proprietorship since 1993. (*Id.*) JB Business Strategies has a bank account with Clear Mountain Bank. (*Id.* at 46:11-25.) Boczek also has a personal account with the same bank. (*Id.*) The payments he made on the auto loan at issue were from an account with Clear Mountain Bank. (Account Statements, Ex. 4.) Boczek admitted during his deposition that he may have used the business account to make the loan payments to PenFed, although he was not sure:

> Q. What bank accounts have you used to make payments to PenFed on the auto loan?
> A. I'm not 100 percent sure, but I think we've used a variety of our bank accounts or -- year. I -- I -- we may -- use our personal and we may have paid out of the business, but I'm not for certain.

(Boczek Dep., Ex. 1 at 46:4-10.)

Boczek also admitted during his deposition that the PenFed employees with whom he spoke when he made the payments did not mislead or threaten him:

> Q. … Did any PenFed employee make a fraudulent statement to you?
> A. Not to my knowledge.
> Q. Did any PenFed employee make a deceptive statement to you?
> MR. CAUSEY: Objection, legal conclusions.
> THE DEPONENT: I -- I – that's a – deceptive's a -- I mean, I -- I -- you mean attempting to deceive me into believing that I owed money when I didn't?
> BY MR. GRAZIANO:

Q. Into making you believe anything that was not true.

A. I -- I would have to say no to that because I owed money. I think we just have a disagreement on the terms of how -- what I believe and what they believe, and so on and so forth. But, you know, I've acknowledged that I owe PenFed a monthly payment on my wife's vehicle.

Q. And it -- it is the answer the same with respect to whether any PenFed employee made a misleading representation to you?

MR. CAUSEY: Objection, calls for legal conclusion.

THE DEPONENT: Again, not to my knowledge.

…

Q. All right. Did -- did anybody at -- who worked for PenFed at any point in time make any threats to you?

A. There was one lady. And to be clear, for the most part, A, I will commend PenFed. Their people speak English, they enunciate, they pronunciate. They understand the English language, and they are above average, to the most part are average intelligence level unlike a lot of customer service reps that you deal with and call centers offshore.

And they are pleasant and they're fairly knowledgeable and they're understanding, disagreeing to disagree and so on and so forth, but there was one lady that was just either having a bad day or didn't -- shouldn't be in that line of work.

And I -- I -- you know, she said something like, "Why don't you just pay your debt or why don't you just make your payment like you're supposed to," or something to that effect. That was a rare occasion. I only have a remembrance of a call like that once.

(Boczek Dep., Ex. 1 at 70:24-74:20.)

The transcripts from the phone calls, which were recorded, buttress Boczek's testimony. (*See* 3/23/2023 Tr., Ex. 5.) For example, the employee with whom Boczek spoke on March 23, 2023, clearly disclosed the fee and explained—without prompting—that Boczek "can avoid that payment fee by making the payment online or by using the automated system." (*Id.* at 3:18-4:25.) The next time he made a payment, on June 1, 2023, Boczek told PenFed's employee that he believed the fee was "totally illegal[,]" and that PenFed would "settle in court soon[,]" but authorized her to "go ahead" and process the payment "anyway[.]" (6/1/2023 Tr., Ex. 6 at 4:3-13.)

## Attempts to Identify Non-Party Class Members

During discovery, Boczek requested information and documents designed to identify potential class members. (Pl.'s Ex. C, Dkt. No. 101-3.) For example, Interrogatory No. 15 asked PenFed to "[i]dentify the number of Borrowers in the state of West Virginia whom Defendant has charged or collected a Pay-to-Pay Fee from April 1, 2019 to present …?" (*Id.* at Interrog No. 15 (emphasis removed).) Boczek also asked PenFed to provide certain details about "each Pay-to-Pay Fee" PenFed charged during the same time period. (*Id.* at Interrog. No. 16.)

In response, PenFed explained that it "cannot ascertain [the relevant information] through electronic searches of its records or any other methods that would not require PenFed to manually review records related to individual consumers." (*Id.* at Interrog. Nos. 15-16.) Specifically, "PenFed's records related to non-mortgage consumer loans are not maintained in a manner that would allow PenFed to conduct an electronic search for convenience fees charged for loan payments based on the location of the property that secured the loans, based on the residence of the consumers at the time that they entered into the loans, or based on the location of the consumers at the time that they made payments that included a convenience fee." (*Id.*)

PenFed's corporate representative, Christopher Martin, explained the limitations on PenFed's search capabilities in more detail during a Rule 30(b)(6) deposition. (30(b)(6) Dep., Ex. 2 at 142:8-152:18.) PenFed was able to identify instances in which the fee was charged during the relevant time period by searching for a specific transaction code and date range. (*Id.* 131:4-24, 142:17-143:5.) In attempting filter the results based on the member's location, however, Martin identified a "core limitation": "the address of the member at the time a transaction is initiated … [is] not part of the transaction record." (*Id.* at 151:22-152:18.) As a result, to filter the results based on geography, PenFed was limited to a member's address as of the time the data was searched:

> Q.  I assume -- and so the state identification process here took into account any updated information that you received from the member and your process that you described earlier of doing sort of a national address update, that whole process was taken into account at arriving at what state was used here; right?
>
> A.  You might have to clarify your question. I think the way I would describe it is that the state code that's listed in the reports is the state code that was in place on the member's profile at the time we pulled this data. So.
>
> Q.  Right.
>
> A.  You know, the historical information around a member's address is not part of the transaction record. So if a member, for example, lived in West Virginia -- or for example, if a loan was originated in Florida and the member moved to West Virginia a month before this report was pulled, it  would show up on this report as a West Virginia via refund [*sic*] because it's based on where the member lived at the time that the report was pulled. Not based on where the member -- what the member's address was at the time that the transaction took place.

(*Id.* at 147:20-148:19.)

Boczek's counsel asked whether PenFed could essentially reverse the process by first searching for loans originated in West Virginia and then cross-referencing the results with the fee data. (*Id.* at 151:1-21.) As Martin testified, it would be impossible to do so without manually reviewing loan documents for every loan PenFed issued globally during the relevant period, however, because the electronic system of record does not have a field specifying a member's state of residence as of the date on which a loan is originated:

> Q.  … What if you -- could you query those who had a loan originated in West Virginia and cross reference it with this list, for example, and then have that cross reference basically compared and come up with probably a relatively small group that would be different and then you can analyze that group?
>
> A.  So to my knowledge we do not store -- in a data field we do not store the state where the member resided at the time that the loan was originated. Now that data does exist, for example, in documentation. So, for example, like in the promissory note that's produced, right, when the member originates the loan, their address is listed in the promissory note, but it's not -- there isn't a field in Hogan that says, you know, state at the time of origination. So I think that would inhibit the proposal that you're suggesting.

(*Id.*)

As noted, PenFed was able to match historical fee records to current addresses. (Pl.'s Ex. C, Dkt. No. 101-3 at Interrog. No. 15.) Using those parameters, PenFed identified 422 members whose addresses on file as of the date of the search were in West Virginia and who were charged convenience fees in connection with loan payments between April 2019 and the date of the search.[1] (*Id.*) Those members paid a total of 1,497 convenience fees. (*Id.* at Interrog. No. 16.)

PenFed could theoretically filter the results of its search to remove any of the 422 members who did not live in West Virginia at the relevant time by "go[ing] back and look[ing] at the promissory note documentation" or "run[ning] an additional query[.]" (30(b)(6) Dep., Ex. 2 at 148:20-149:7.) There is no feasible method, however, to ascertain members who lived in West Virginia at the relevant time but moved elsewhere because it would require reviewing individual records for every member of PenFed who had any address change during the relevant time period:

> Q. Okay. Then the -- I guess the harder scenario of being entirely accurate is that it might be under -- the charge could be under inclusive in the sense that if someone lives in West Virginia paid fees for three years and right before you ran your data moved to Florida, they wouldn't be picked up; right?
> A. Yeah, that's correct.
> Q. Okay. Any way of running that data to avoid being under inclusive?
> A. I think that kind of query would be extremely laborious. I mean, in essence, you would have to look at all of the address changes that took place for the entire membership to determine, you know, whether or not any of them had had an address change involving the State of West Virginia, you know, during the relevant time period. So that would be a massive undertaking to query all of the members' records that would be associated in that kind of request.

(*Id.* at 150:5-24.)

---

[1] There are different end dates because PenFed's records related to credit cards are stored in a different system than the records for other loans, and the systems were searched on different dates.

## IV. STANDARD

"A party seeking class certification must do more than plead compliance with … Rule 23." *EQT Prod. Co.*, 764 F.3d at 357 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). "Rather, the party must present evidence that the putative class complies with Rule 23." *Id.* (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)).

"Concomitantly, 'the district court has an independent obligation to perform a rigorous analysis to ensure that all of the prerequisites [for class certification] have been satisfied.'" *Career Counseling, Inc.*, 91 F.4th at 206 (quoting *EQT Prod. Co.*, 764 F.3d at 358) (internal quotation omitted). "[A] district court may need to 'probe behind the pleadings before coming to rest on the certification question.'" *EQT Prod. Co.*, 764 F.3d at 358 (quoting *Comcast Corp.*, 569 U.S. at 33) (internal quotation omitted). "Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim … because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp.*, 569 U.S. at 33 (quotation omitted).

## V. ARGUMENT

### A.    THE PROPOSED CLASS IS NOT ASCERTAINABLE.

"Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable." *EQT Prod. Co.*, 764 F.3d at 358 (quotation omitted). "A class cannot be certified unless a court can readily identify the class members in reference to objective criteria." *Id.* (quotation omitted). "[I]f class members are impossible to identify without extensive and individualized fact-finding or mini-trials, then a class action is inappropriate." *Id.* (quotation omitted). The requirement "will not be deemed satisfied unless … it is administratively feasible for the court to determine whether a particular individual is a member." *Id.* (quotation omitted).

11

Boczek has not satisfied his burden of establishing ascertainability for three reasons that are explained in more detail below. First, determining whether any particular loan is covered by the WVCCPA would require individualized fact-finding and mini-trials to determine the primary purpose for which the loan proceeds were used. Second, there is no administratively feasible method for determining whether any specific transaction has sufficient ties to West Virginia. Third, allegations of fraudulent and threatening statements are inherently individualized.

### 1. Determining Whether Borrowed Funds Were Used Primarily for Personal, Family, or Household Purposes Requires Fact-Intensive, Individualized Inquiries.

"An essential element of a cause of action" under each of the relevant provisions of the WVCCPA is "the collection or attempted collection of a "'claim.'" *Adkins*, 2016 WL 7451619, at *3. The concept of a "claim" is at the heart of each provision Boczek has invoked. Indeed, the prefatory clauses in both Section 127 and Section 128 limit the enumerated prohibitions to conduct employed in the collection of a "claim." W. Va. Code §§ 46A-2-127 (prohibiting the use of certain means "to collect or attempt to collect claims") & 46A-2-128 (prohibiting the use of certain means "to collect or attempt to collect any claim"). While Section 124 does not use the term "claim" in the same manner as Section 127 and 128, it incorporates the term by regulating the conduct of a "debt collector[.]" W. Va. Code § 46A-2-124. The WVCCPA defines "debt collector" as a person engaged in "debt collection[,]" which, in turn, is defined as "any action, conduct or practice of soliciting claims for collection or in the collection of claims." W. Va. Code § 46A-2-122 (c)-(d).

The WVCCPA defines "claim" as follows: "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or service which is the subject of the transaction is primarily for personal, family or household purposes, whether or not such obligation has been reduced to judgment." W. Va. Code § 46A-2-122(b). Thus, to resolve the claims asserted by each individual class member, the Court or jury

must be able to tell whether a specific debt "was incurred 'primarily for personal, family, or household purposes,' and thus covered by the statute, or primarily for commercial purposes, which would not be covered." *Adkins*, 216 WL 7451619, at *4 (citing *Morris*, 305 S.E.2d at 584).

In analyzing whether a transaction was for consumer purposes, courts perform fact-intensive inquiries, focusing on specific details of the transaction. Two cases in which the Supreme Court of West Virginia reached opposition conclusions, *Fleet* and *Morris*, illustrate the point.

*Fleet* held that assessments by a homeowners association were consumer transactions. 772 S.E.2d at 376-79. The Court's analysis focused on the specific terms of the declaration that established the purpose of the assessments, which is quoted *verbatim* in the opinion. *Id.* at 377. Since the assessments were to be used for improving and maintaining "common areas of a planned community," which included "common roads and common recreational areas within the community," the Court found they were "primarily for personal, family, or household purposes, and, therefore, such assessment were 'claims' pursuant to W. Va. Code § 46A-2-122(b)." *Id.*

By contrast, *Morris* held that personal guarantees were not covered by a different provision of the WVCCPA because they were not consumer loans. 305 S.E.2d at 582-84. The guarantors were individuals and had pledged their personal home as security for the loans. *Id.* at 586 n.9. Nevertheless, the Court held that the WVCCPA did not apply because the proceeds of the loan were used to finance an automobile dealership owned by the guarantors. *Id.* at 584.

*Fleet* and *Morris* demonstrate the nuanced approach necessary to determine the purpose of a transaction. On a superficial level, both holdings are somewhat counterintuitive. If a debtor's status as an individual, as opposed to a corporate entity, was dispositive, then the personal guarantees in *Morris* would have qualified as consumer loans. Conversely, if the fact that funds are used to improve property owned by a corporate entity was dispositive, then the assessments in

13

*Fleet* would not have been covered by the WVCCPA. In both cases, the Court reached a different conclusion by performing a deeper analysis of the actual purpose for which the funds were used.

Federal courts also use highly individualized inquiries to analyze whether a transaction was primarily for consumer purposes. Indeed, the Supreme Court of the United States has acknowledged the task can be difficult: "We do not suggest that it always will be easy to determine whether the opening of a credit account involves an extension of consumer credit." *Am. Exp. Co. v. Koerner*, 452 U.S. 233, 245 (1981). The Court even highlighted one of the specific categories of debt at issue here, noting that "often it is difficult to characterize the overall purpose of a credit card account that allows for a large number of individual transactions." *Id.* (citation omitted).

Analyzing whether a loan was for consumer purposes can require individualized proof even when the proceeds are used to purchase a single, identifiable item, such as a car, if that item is used for mixed purposes. *McLaughlin v. Chrysler Corp.*, 262 F. Supp. 2d 671, 680-82 (N.D.W. Va. May 3, 2002), *aff'd*, 47 F. App'x 659 (4th Cir. 2002). For example, the plaintiff in *McLaughlin* claimed he was a "consumer" under West Virginia's Lemon Law because he used a vehicle for personal purposes in addition to business ones. *Id.* The Court rejected that argument upon finding that the plaintiff purchased and used the vehicle "primarily" for his business. *Id.*

The testimony of the named plaintiff in this case further demonstrates the point. Boczek is a sole proprietor and admitted during deposition that he may have used a business account to make the payments at issue in this case, although he was not sure: "I'm not 100 percent sure, but I think we've used a variety of our bank accounts … we may – use our personal and we may have paid out of the business, but I'm not for certain." (Boczek Dep., Ex. 1 at 46:4-10.)

Standing alone, the fact that Boczek may have used business funds to make loan payments may not prove to be dispositive of his individual claims. The balance may well have tipped in the

opposite direction, however, if Boczek also testified that he primarily used the vehicle for the benefit of the company that made the payments. *See McLaughlin*, 262 F. Supp. 2d at 680-82. Either way, one thing is clear: to determine whether a debt was incurred for consumer-related purposes, it is necessary to understand details about the actual use to which the funds were put.

Several federal courts have denied class certification in similar cases due, at least in part, to the fact-intensive inquiry necessary to determine whether different types of transactions involved covered purposes. *See*, *e.g.*, *In re OnStar Contract Litig.*, 278 F.R.D. at 380-81; *Loughlin*, 2018 WL 1894609, at *15-16; *Toldy*, 2011 WL 4634154, at *3-4; *Powers*, 2011 WL 3811129, at *14-20; *Roman*, 2001 WL 322563, at *2. The rationale of those cases applies equally here.

For example, like Boczek's claims, *In re OnStar Contract Litig.* involved the purchase of vehicles. The court explained why class certification was inappropriate as follows:

> Many people purchase or lease vehicles for both personal and business uses (e.g., realtors, salespersons, small business owners, construction workers, etc.). Excluding "persons or entities who purchased their vehicles primarily for commercial or business purposes" from the proposed class will not resolve this issue. If a person purchased a vehicle for both personal and business uses, who decides which use is *primary*? Plaintiffs' position appears to be that the class plaintiffs would simply make that determination on their own—but that gets us nowhere. The Plaintiffs in both *Zine* and *Sautner* believed their personal use of their vehicle was primary and their commercial use secondary—that is why they filed suit under the MCPA. But the defendant can challenge that assertion and establish that the plaintiff's primary use was commercial, thereby entitling it to summary judgment.

278 F.R.D. at 381.

As previously noted, credit cards—which make up approximately 30% of the transactions at issue in this case—can be particularly tricky because "often it is difficult to characterize the overall purpose of a credit card account that allows for a large number of individual transactions." *Am. Exp. Co.*, 452 U.S. at 245. Loans that are disbursed in lump sums for non-specified purposes,

such as the personal loans at issue in this case, are even more problematic because there is no telling how the funds were used short of conducting targeted discovery for each individual loan. That dilemma figured prominently in the rationale for denying class certification in *Loughlin*, 2018 WL 1894609, at \*16, and *Powers*, 2011 WL 3811129, at \*17.

The Fourth Circuit's recent decision in *Career Counseling, Inc.* is also instructive, although it did not turn on whether a transaction was for consumer purposes. The plaintiff asserted claims under the Telephone Consumer Protection Act ("TCPA") after receiving unsolicited faxes. 91 F.4th at 205. The Court held that the TCPA covers stand-alone fax machines but not online fax services. *Id.* at 208-11. It then affirmed the denial of class certification on ascertainability grounds because the issue of "whether each recipient was using a stand-alone fax machine at the relevant time" would have required "an individualized inquiry[.]" *Id.* at 211.

*Career Counseling, Inc.* is analogous to this case. Both cases present the key issue of whether a consumer protection statute applies to a transaction based on facts that are not readily available to the named parties or the Court. Although one case involves fax machines and the other involves loans, the common denominator is that an unmanageable amount of mini-trials would be necessary to parse the fax machines and loans that are protected by statute from those that are not. For that reason, standing alone, the Court should deny class certification.

### 2. There Is No Administratively Feasible Method for Determining Whether an Account Has Sufficient Ties to West Virginia.

Ascertainability "will not be deemed satisfied unless … it is administratively feasible for the court to determine whether a particular individual is a member." *EQT Prod. Co.*, 764 F.3d at 358 (quotation omitted). As such, class certification is not appropriate if "the administrative burden of identifying class members … would render class proceedings too onerous[.]" *Id.*

16

Boczek appears to concede that a transaction must have a sufficient tie to West Virginia to be prohibited by the WVCCPA. (*See* Pl.'s Mem. at 1-2.) Indeed, Boczek's proposed class definition is limited to persons "with West Virginia addresses[,]" and his motion for class certification is replete with references to "West Virginia consumers[.]" (*Id.*) That concession makes sense, of course, because a West Virginia statute could not prohibit a federally-chartered entity with a principal place of business outside of West Virginia from charging a fee to a person who is also located outside of West Virginia.

Despite acknowledging the geographical requirement, Boczek does not explain *how* the Court can ascertain which transactions have sufficient ties to West Virginia and which fees do not. (*See id.* at 6.) Instead, he simply refers to a spreadsheet PenFed produced during discovery. (*Id.*)

As explained above, the data PenFed analyzed and produced in this case has significant gaps due to limitations on PenFed's search capabilities. (30(b)(6) Dep., Ex. 2 at 142:8-152:18.) While PenFed was able to match historical fee records to current addresses, "the address of the member at the time a transaction is initiated … [is] not part of the transaction record." (*Id.* at 151:22-152:18.) As a result of that "core limitation[,]" the data is both overinclusive and underinclusive. (*Id.* 142:8-152:18.)

The data is overinclusive because it necessarily includes all fees charged to members who did not reside in West Virginia when they paid the fees at issue but later relocated to West Virginia. (*Id.* at 147:20-148:19.) Similarly, the data is underinclusive because it necessarily omits all fees charged to members who resided in West Virginia at the relevant time but later moved elsewhere. (*Id.* at 150:5-24.) Boczek's counsel probed PenFed's corporate representative in the hopes of discovering an administratively feasible way to solve the geography problem. (*Id*. at 142:8-152:18.) As the witness explained, however, matching fee records to address changes "would be

17

extremely laborious" because it would require manually reviewing documents in individual loan files. (*Id.* at 150:5-24, 151:1-21.)

Significantly, Boczek, who bears the burden, has not designated an expert witness who can opine on the issue of administrative feasibility. Nor does his motion even attempt to propose a feasible method for identifying class members who should or should not be part of a class based on when they moved to or from West Virginia. (*See* Pl.'s Mem. at 6.) The only relevant evidence, therefore, is Martin's testimony that analyzing the issue would be "extremely laborious" and require manually reviewing documents in individual loan files for each one of PenFed's millions of members who submitted an address change during the relevant period. (30(b)(6) Dep., Ex. 2 at 150:5-24, 151:1-21.) Accordingly, the Court should hold that Boczek has failed to satisfy his burden of proving ascertainability. *See In re OnStar Contract Litig.*, 278 F.R.D. at 373 (ascertainability not satisfied where "[t]he data maintained by OnStar … will not be sufficient to determine if any given individual meets all of the requirements of a given proposed class").

### 3. Allegations of Fraudulent and Threatening Statements Are Individualized.

Boczek cannot satisfy the ascertainability requirement with respect to claims asserted under Section 124(f), 127, 127(d), or 127(g) for the additional reason that the conduct prohibited by those provisions is inherently individualized. Section 124(f) prohibits "threat[s]" and Section 127 prohibits certain types of "representation[s.]" W. Va. Code §§ 46A-2-124(f), 46A-2-127. To analyze whether PenFed made threatening or deceptive statements, it is necessary to analyze each statement in the relevant context. *See*, *e.g.*, *Rhoades v. W. Virginia Credit Bureau Reporting Servs., Inc.*, 96 F. Supp. 2d 528, 534 (S.D.W. Va. 2000); *Sheridan*, 776 F. Supp. 3d at 387.

For example, the *Rhoades* court expressed uncertainty about whether a specific collection notice contained an "illegal threat or implicit coercion" but nevertheless denied cross-motions for

summary judgment and held that "[t]he Court's failure to apprehend a threat may be remedied by Plaintiff's explication at the trial of this matter." 96 F. Supp. 2d at 534. The court's implicit acknowledgement that the issue of whether a communication could be perceived as threatening or coercive can depend on contextual information specific to that communication underscores the need for individualized inquires to test any allegations that PenFed made "threats."

*Sheridan* also highlights the need to analyze specific communications in the relevant context in order to determine whether they are threatening or deceptive. In that case, which also arises from convenience fees, the court dismissed claims asserted under Sections 124(f), 127, 127(d), and 127(g) because the complaint did not contain any substantive allegations identifying fraudulent statements or threats.[2] 776 F. Supp. 3d at 387.

## B.    BOCZEK'S CLAIMS OF FRAUD AND THREATS FAIL TYPICALITY.

The Court should decline to certify a class encompassing claims under Sections 124(f), 127, 127(d), or 127(g) for the additional reason that Boczek's claims are not "typical of the claims of the class[,] as required under Rule 23(a)(3). Fed. R. Civ. P. 23(a)(3). "To be given the trust responsibility imposed by Rule 23, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (quotation omitted). "That is, the named plaintiff's claim and the class claims [must be] so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* (quotation omitted). "The essence of the typicality

---

[2] The court recently entered summary judgment in favor of the defendant with respect to the Section 124(f) claim, denied cross-motions for summary judgment as to the Section 127 claims, and certified a class without addressing the key issues raised in this brief. *Sheridan v. Ally Fin., Inc.*, No. 5:23-CV-00616, 2025 WL 2055556, at *3 (S.D.W. Va. July 22, 2025); *Sheridan v. Ally Fin., Inc.*, No. 5:23-CV-00616, 2025 WL 2055750 (S.D.W. Va. July 22, 2025).

requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Id.* (quotation omitted).

 In light of Boczek's testimony about his interactions with PenFed employees, his interests are not aligned with those of any absent class members who could assert claims based on allegedly deceptive or threatening statements. Boczek readily admitted that none of the PenFed employees with whom he spoke made any fraudulent, deceptive, misleading, or threatening statements to him. (Boczek Dep., Ex 1 at 70:24-74:20.) In fact, with the exception of one minor grievance about an employee commenting on Boczek making late payments, Boczek "commend[ed]" PenFed's customer service representatives. (*Id*.)

## C.    BOCZEK CANNOT ESTABLISH PREDOMINANCE OR SUPERIORITY.

Rule 23(b)(3) precludes class certification unless two elements are met.[3] Fed. R. Civ. P. 23(b)(3). First, Boczek must prove that "the questions of law or fact common to class members predominate over any questions affecting only individual members[.]" *Id.* Second, Boczek must prove "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* Boczek cannot clear either of those hurdles.

### 1.    Boczek Cannot Establish Predominance.

"Rule 23(b)(3)'s predominance requirement is necessarily intertwined with Rule 23(a)'s commonality requirement." *Stafford v. Bojangles' Restaurants, Inc*., 123 F.4th 671, 679 (4th Cir. 2024). "Predominance presupposes that a common question exists and measures the question's significance to the pending litigation. While commonality serves to ask whether class-wide proceedings are even possible, predominance tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* (quotation omitted).

---

[3] Boczek does not claim subparagraphs (1) or (2) of Rule 23(b) apply. (*See* Pl.'s Mem. at 10-14.)

As explained in Section A above, several key issues in this case cannot be resolved on a class-wide basis. Chief among those issues is whether specific transactions involving each class member were for personal, family, or household purposes, as required for the WVCCPA to apply. *Adkins*, 2016 WL 7451619, at *3. There can also be no common answers to other important questions, such as whether individual transactions have a sufficient tie to West Virginia, whether PenFed made a threatening statement to a class member, or whether it made a fraudulent statement.

By contrast, Boczek's motion lists just one concrete issue related to liability that could potentially be resolved on a class-wide basis: "Whether any statute expressly authorizes the Pay-to-Pay fees PenFed collected from Plaintiff and the class[.]" (Pl.'s Mem. at 8.) Boczek lists three other issues, but none of them suffice.

First, Boczek contends that the issue of "[w]hether Defendant misrepresented the amount of any claim" has a common answer. (*Id.*) He is wrong for the reasons explained in Sections A.3 and B above. Analyzing whether a defendant made a misrepresentation requires considering a specific statement in the context in which it was made.

Second, Boczek vaguely asserts that the question of "[w]hether Defendant is entitled to any class-wide defense" is subject to a common answer. (*Id.*) He does not, however, identify any specific "defense," let alone explain why it is subject to class-wide resolution. (*Id.*)

Third, Boczek claims the amount of any statutory penalty is a common issue. (*Id.*) While it is theoretically possible for the Court to address statutory penalties on a class-wide basis, the analysis is fundamentally different than it would be in an individual action. *Wakefield*, 51 F.4th at 1120-25. Courts have held that aggregated statutory damage awards may be unconstitutional "even where the prescribed per-violation award is constitutionally sound" and may be permissible in an

21

individual action. *Id.*; *see also Golan*, 930 F.3d at 962-63. If anything, the additional limitations on applying statutory penalties in a class action weighs against class certification.

### 2.    Boczek Cannot Establish Superiority.

The manageability issues described in Section A above should preclude any finding that a class action is a superior method for resolving the claims in this case. The practical difficulties in weeding out class members who do not have viable claims, either because they did not use loan proceeds for consumer purposes or were not located in West Virginia at the relevant time, risks exposing PenFed to liability for transactions that were perfectly lawful. Furthermore, to the extent it would be necessary to excise class members who cannot be identified because they moved away from West Virginia, it would "expose [PenFed] to a continued trickle of individual lawsuits and thereby impair the efficiency goal which is a key purpose of the class action mechanism." *Mr. Dee's Inc. v. Inmar, Inc.*, 127 F.4th 925, 932 (4th Cir. 2025).

By comparison, most of the oft-cited benefits of class action treatment are significantly reduced in this case. Class actions allow plaintiffs who suffer a small amount of damages and who could not have "individually marshalled the resources" to pursue legal action to, "through aggregate litigation[,] seek proper vindication in a court of law." *Stafford*, 123 F.4th at 683. The class action mechanism is not needed for that purpose in this case, however, because the WVCCPA itself provides significant incentives to encourage individuals with *de minimis* damages to sue.

As previously explained, the WVCCPA allows a consumer to recover actual damages, a statutory penalty of up to $1,357.66 per violation (after applying an "inflation" adjustment), and attorney's fees. W. Va. Code §§ 46A-5-101(1), 46A-5-104, 46A-5-106. As such, the potential recovery available to an individual who paid the $5.00 fee at issue is more than 271 times the amount of actual damages, before even considering attorney's fees. If a borrower had just $240 in

actual damages from making monthly payments on one loan during the four-year period corresponding to the statute of limitations, he or she could seek up to $65,407.69 in total damages, plus attorneys' fees. Such a significant windfall provides ample incentive to sue.

The stiff penalties available under the WVCCPA are more than adequate to deter violations and encourage individual litigation. *See*, *e.g.*, *Rowden*, 282 F.R.D. at 586-87. In *Rowden*, for example, the court held that individual litigation was "far superior" to a class action because, in part, a similar statutory penalty of $100 to $1,000 per violation of the Fair and Accurate Credit Transactions Act ("FACTA") gave aggrieved individuals "more than sufficient incentive to bring an action even if the amount of recovery is difficult to quantify or relatively small."[4] *Id.*

Finally, resolving the claims in this case on a class-wide basis is disadvantageous for the additional reason that it would strip the WVCCPA's notice-and-cure provision of its efficacy. The WVCCPA requires consumers to use a mandatory notice-and-cure procedure before suing. W. Va. Code § 46A-5-108. The notice-and-cure procedure is designed to give defendants an opportunity to resolve individual claims and avoid litigation. Certifying a class consisting of hundreds of claimants who have not complied with the notice-and-cure requirement would directly undermine the legislative goal of promoting the pre-litigation resolution of claims.

---

[4] The Fourth Circuit rejected a similar argument in *Stillmock v. Weis Markets, Inc.*, but that case is easily distinguished because the court applied a statutory penalty with a $1,000 cap on a per-consumer basis, as opposed to a per-transaction basis. 385 Fed. App'x 267, 272-73 (4th Cir. 2010). Since each class member could recover just $1,000, there was no issue as to whether stacking penalties for recurring transactions would increase an individual class member's potential recovery sufficient to incentivize a lawsuit. Instead, the Court simply found that there was no reason to believe a recovery "of up to $1,000" would encourage individual lawsuits. *Id.* at 274. By contrast, there are plenty of reasons to believe that a potential recovery of $65,407.69 plus attorneys' fees would be adequate to encourage individuals to sue under the WVCCPA.

**VI. CONCLUSION**

In the final analysis, the significant ascertainability and manageability issues in this case far outweigh any benefits to class certification. On the one hand, ascertaining class members would require individualized inquiries into the specific use of loan proceeds by individual borrowers and manually reviewing loan files for individual accounts. On the other hand, the class action mechanism is not necessary to deter violations of the WVCCPA or to provide remedies to individuals with *de minimis* damages because the WVCCPA has stiff civil penalties for precisely those purposes. Accordingly, the Court should deny class certification.

//

//

//

//

//

//

//

//

//

//

DATED: August 29, 2025.          **PENTAGON FEDERAL CREDIT UNION**

*/s/ Kinsey M. Novak Booth*
Brian J. Moore (WV State Bar # 8898)
DINSMORE & SHOHL LLP
P.O. Box 11887
707 Virginia Street East, Suite 1300
Charleston, WV 25339-1887
Telephone:  (304) 357-0900
Facsimile:   (304) 357-0919
Email:  brian.moore@dinsmore.com

Kinsey M. Novak Booth (WV State Bar # 14661)
DINSMORE & SHOHL LLP
215 Don Knotts Blvd., Suite 310
Morgantown, WV 26501
Telephone: (304) 225-1416
Facsimile: (304) 296-6116
Email: kinsey.booth@dinsmore.com

Michael A. Graziano (*pro hac vice*)
Sarah A. James (*pro hac vice*)
Eckert Seamans Cherin & Mellott, LLC
1717 Pennsylvania Ave., NW, 12th Floor
Washington, DC 20006
(202) 659-6671
(202) 659-6699 (fax)
mgraziano@eckertseamans.com
sjames@eckertseamans.com

*Attorneys for Defendant*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG DIVISION**

**JOSEPH BOCZEK, on behalf of**
**Himself and all others similarly situated,**

      **Plaintiff,**

**v.**                                                       **CIVIL ACTION NO. 1:23-cv-43**
                                                          **JUDGE KLEEH**
**PENTAGON FEDERAL CREDIT UNION**
**d/b/a PENFED,**

      **Defendant.**

<u>**CERTIFICATE OF SERVICE**</u>

      I, Kinsey M. Novak Booth, hereby certify that on August 29, 2025, a true copy of the foregoing ***PENTAGON FEDERAL CREDIT UNION'S OPPOSITION TO JOSEPH BOCZEK'S MOTION FOR CLASS CERTIFICATION*** was filed and served upon the following counsel of record through the CM/ECF system:

> Patricia M. Kipnis, Esq.
> Bailey & Glasser LLP
> 923 Haddonfield Road
> Suite 300
> Cherry Hill, NJ 08002
> pkipnis@baileyglasser.com
> vpierre@baileyglasser.com
>
> Jason E. Causey
> Katz Kantor Stonestreet & Buckner, PLLC
> 206 South Walker Street
> Princeton, WV 24740
> jcausey@kksblaw.com
>
> James L. Kauffman
> 1055 Thomas Jefferson Street NW
> Suite 540
> Washington, DC 20007
> jkauffman@baileyglasser.com

Jonathan R. Marshall
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV 25301

Denali S. Hedrick
209 Capitol Street
Charleston, WV 25301
dhedrick@baileyglasser.com

*ATTORNEYS FOR PLAINTIFF*

*/s/ Kinsey M. Novak Booth*
Kinsey M. Novak Booth (WVSB # 14661)

27